# EXHIBIT L

ORIGINAL

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALBERTO HIGGS,

                                        Plaintiff,

                                        23-cv-03943(DG)(SIL)

                        -against-

THE VILLAGE OF FREEPORT, ALL COUNTY HOOK UP
TOWING,INC. d/b/a ALL COUNTY TOWING &
RECOVERY, JOSEPH CALVAGNO, individually,
OFFICER JOHN DOE #1, individually, AND
OFFICER JOHN DOE #2, individually,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                        1757 Merrick Avenue
                        Merrick, New York

                        December 13, 2023
                        12:05 p.m.

           EXAMINATION BEFORE TRIAL of OFFICER

BRENDAN COMBS, one of the defendants s/h/a OFFICER

JOHN DOE #1 in the above-entitled action, held at

the above time and place, pursuant to Notice,

taken before JoAnn O'Loughlin, a Notary Public of

the State of New York.

                        *    *    *

2

A P P E A R A N C E S:

CAMPANELLI & ASSOCIATES, P.C.
Attorneys for Plaintiff
     1757 Merrick Avenue
     Merrick, New York 11566

BY:   ANDREW J. CAMPANELLI, ESQ.


LAW OFFICE OF VINCENT D. McNAMARA
Attorney for Defendants
INCORPORATED VILLAGE OF FREEPORT
s/h/a THE VILLAGE OF FREEPORT,
OFFICER JOHN DOE #1 AND JOHN DOE #2
     1045 Oyster Bay Road
     East Norwich, New York 11732

BY:   HELEN M. BENZIE, ESQ.


QUATELA CHIMERI PLLC
Attorneys for Defendants
ALL COUNTY HOOK UP TOWING, INC.
d/b/a ALL COUNTY TOWING & RECOVERY
and JOSEPH CALVAGNO
     888 Veterans Memorial Highway
     Hauppauge, New York 11788

 BY:   ALEXANDER E. SENDROWITZ, ESQ.




                    *      *      *

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after the service of original & 1 copy of the same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

\*    \*    \*    \*

4

(Plaintiff's Exhibit 1, copy of Freeport Police Department blotter entry dated 11/10/2020 Bates stamped 11/30/2023 FREEPORT #13, was marked for identification.)

(Plaintiff's Exhibit 2, copy of ejustice read-out, two pages, Bates stamped 11/30/2023 FREEPORT # 3 and #4, was marked for identification.)

(Plaintiff's Exhibit 3, copy of email dated 10/26/2016 to All Sworn Personnel from Deputy Chief Michael J. Smith Bates stamped 10/11/2023 FREEPORT #69, was marked for identification.)

(Plaintiff's Exhibit 4, copy of FREEPORT POLICE DEPARTMENT MOTOR VEHICLE IMPOUND WORKSHEET Bates stamped 11/30/2023 FREEPORT #2, was marked for identification.)

(Plaintiff's Exhibit 5, copy of FREEPORT POLICE DEPARTMENT VEHICLE RELEASE AUTHORIZATION Bates stamped 11/30/2023 FREEPORT #12, was marked for identification.)

5

(Plaintiff's Exhibit 6, copy of letter dated November 17, 2020 to Alberto Higgs from Freeport Police Department Bates stamped 11/30/2023 FREEPORT #6, was marked for identification.)

B R E N D A N   C O M B S, the witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. CAMPANELLI:

Q.    What is your name?

A.    Brendan Combs.

Q.    What is your address?

A.    Forty N Ocean Avenue, Freeport, New York 11520.

Q    Good afternoon.

A    How are you?

Q    Hi.  My name is Mr. Campanelli.  I'm going to ask you a number of questions.  For your reference, I represent the plaintiff in this action, Mr. Higgs.

A    Okay.

Q    In answering my questions today, I ask that you follow three simple instructions.

First, when I ask a question, if

6

COMBS

it's not clear to you, please tell me it's not clear and I will employ my best efforts to make it clear for you; do you understand?

A    Yes.

Q    Second, as you can see, sitting to your right is a stenographer, who's writing down every word that's said.  For her benefit, when I begin to pose a question, even if you think you know the answer, please allow me to finish my question before you start to answer, understood?

A    Yes.

Q    And finally, also for her benefit, when I ask a question, you must respond to them orally, she can't record the nod of a head up and down or side to side, understood?

A    Yes.

Q    Great, thank you.

What is your name, sir?

A    Brendan Combs.

Q    Mr. Combs, what is your occupation?

A    Police officer.

Q    When did you first acquire a position as a police officer?

A    In July of 2013.

7

COMBS

Q    With whom did you obtain a position as a police officer?

A    NYPD.

Q    Prior to obtaining a position as a police officer with the NYPD, did you receive any type of formal training?

A    Prior to being a police officer?

Q    Yes.

A    No.

Q    So what happened was you were hired by the police department and then you went into the police academy, correct?

A    Yes.

Q    Did you complete your training at the police academy?

A    Yes.

Q    How long did that take?

A    Approximately six months.

Q    When did you complete that training?

A    In December of 2013.

Q    When you completed that training, did you then undertake duties as a police officer of the NYPD?

A    Yes.

8

COMBS

Q     What were your duties?

A     I was assigned to an Impact position, which was a foot post in Brooklyn, vehicle traffic law, enforce rules and regulations, penal law, respond to emergencies.

Q     Did there come a time when you left the NYPD to go work for the Freeport Police Department?

A     Yes.

Q     When did that occur?

A     April of 2015.

Q     Did you accept a position as a police officer with the Freeport Police Department?

A     Yes.

Q     Prior to undertaking duties as an officer of the Freeport Police Department, did you receive any additional training to enforce any code, rules or regulations of the Freeport Police Department?

A     Not prior to being hired, but once I was hired, I undertook approximately six weeks of field training.

Q     Was that provided by the Nassau

COMBS

County Police Department or the Freeport Police Department?

A        Freeport Police Department.

Q        What did the field training consist of?

A        Getting associated with local rules, regulations and procedure.

Q        Were those rules, regulations and procedure of the Village of Freeport?

A        Yes.

Q        Did they give you copies of any rules or procedures of the Village of Freeport?

A        I believe they provided us with the rules, regulations and like standard operating procedures.

Q        When you became a police officer of the Freeport Police Department, what was your rank?

A        Police officer.

Q        What were your duties as police officer?

A        When I was originally hired, I was assigned to patrol, so respond to emergencies, calls, vehicle traffic law, enforce penal law.

10

COMBS

Typical police officer duties.

Q      Were you still working for the Freeport Police Department on November 10th of 2020?

A      Yes.

Q      At that time, what were your duties for the police department?

A      I was assigned to SET, which is the Special Enforcement Team.  It's a quality of life assignment in which I wrote Village ordinance, vehicle traffic law, we were assigned to Woodcleft Canal during the summer and also responding to police emergencies and 911 calls.

Q      You testified that you wrote ordinance.

You didn't actually write ordinances, you were charged with enforcement of ordinances?

A      Yes.

Q      What type of ordinances were you charged with enforcement of?

A      Open containers, urinating in public; quality of life violations.

Q      Were you assigned individually, did

11

COMBS

you have a partner, were you part of a unit?

A    I was part of a unit, which is the Special Enforcement Team.  I did have a partner. On this date that we're referencing, he was not working.

Q    How would you undertake efforts to enforce the ordinance; would you receive a directive to go to a location, would you receive a complaint from a constituent?

A    Sometimes there were like frequent checks or concerned citizens that would call and say can you check this area out, but majority of the time it was just patrolling the streets and observing behavior.

Q    Were there ever occasions when a superior officer would direct you to either go to a specific location or undertake a specific act?

A    Sometimes we were assigned to go to a specific location as the community requested.

Q    Was there a superior officer under whose supervision they could direct you to do something like that?

A    Yes.

12

COMBS

Q      Who was your superior officer?

A      There were several, but my direct supervisor was Sergeant Joseph China.

Q      Officer Combs, I'm going to show you what has been marked as Plaintiff's Exhibit 1. It appears to be some type of document generated by the Freeport Police Department.  The Bates number I'm going to refer to is FREEPORT #13.

I'll ask you to look at that document and ask if you recognize it.

(Handing.)

(Witness reviewing document.)

Q      I'm going to ask you to look at what's been marked as Plaintiff's Exhibit 1 and ask if you can tell me what that document is.

A      I believe this is a blotter printout.  I am not usually involved in printing out blotters, so I'm not entirely sure what this is, but this is what it appears to be.

Q      The blotter seems to indicate that it was generated in connection with an event which transpired on November 10, 2020.

Were you working for the Freeport Police Department on November 10, 2020?

13

COMBS

A       Yes.

Q       Did there come a time when you went to 6 Leonard Avenue in the Village of Freeport?

A       Yes.

Q       For what purpose did you go to that location?

A       I don't know if I arrived there with a purpose. I was -- I don't recall many of the events of that day, but typically we drove around, like I said, looking for quality of life and violations.

Q       In this police blotter, it says How Received, it says OFFICER INITIATED.

        Do you know what that means?

A       Means I initiated it.

Q       To the left of that, it says Call Type:   IMPOUND-SCOFFLAW.

        Do you know what that means?

A       Impound for a scofflaw.

Q       What does that mean; does that mean that you were sent out to pick up a vehicle because it was a scofflaw vehicle or does it mean something else?

A       I wasn't sent anywhere.  It says

14

COMBS

officer initiated and the call type was an

impound for a scofflaw.

Q      Then below that, it says Location of

Assignment:  6 Leonard Avenue Freeport and then

it says Dispatched Date:  11/10/2020.

Were you dispatched by someone to go

to that location on that date?

A      No.

Q      It says Call Taker:  61900.

Do you know what that indicates?

A      It's whoever can put the blotter as

the desk personnel, so either the dispatcher or

the desk monitor creates the blotter, which is

like an event type and that's the person who put

in their serial number.

Q      Then it says OFFICERS INVOLVED

Brendan Combs and Kyle Pistani.

Do you know Officer Kyle Pistani?

A      Yeah.

Q      Did he accompany you to 6 Leonard

Avenue, Freeport, that day?

A      I don't recall.

Q      Do you know what, if anything, you

did when you arrived at 6 Leonard Avenue,

15

COMBS

Freeport, that day?

A    Like I said, I don't recall the exact event, but based on paperwork that I've reviewed, we impounded a vehicle that was parked in the street.

Q    I'm going to show you what's been marked as Plaintiff's Exhibit 4.  It's entitled FREEPORT POLICE DEPARTMENT MOTOR VEHICLE IMPOUND WORKSHEET.

(Handing.)

Q    I ask if you can identify that document.

(Witness reviewing document.)

A    Yes, impound sheet.

Q    Did you prepare that impound sheet?

A    Yes.

Q    What event did you prepare that impound sheet in connection with?

A    An impound for a scofflaw violation.

Q    What does that mean, a scofflaw violation?

A    The Village of Freeport Police Department generates a list of scofflaw vehicles which have not paid summonses to the Village and

16

COMBS

they're in violation of a scofflaw.

Q    Number one, are you provided with a copy of that list?

A    Yes.

Q    Who prepares that list?

A    Well, I believe one of the chiefs.

Q    What directions, if any, have you been provided to with regard to what your duties are with respect to scofflaw vehicles?

A    If you would come across a scofflaw vehicle, it is to be impounded if it's in the street.

Q    So on this occasion, how did you ascertain that a vehicle located on the street was a scofflaw vehicle?

A    You could check the plate on the vehicle against the list sent by the department.

Q    So on this day were you just driving down the street and you decided to run this plate?

A    I don't recall.

Q    Well, are you ever directed by someone at the police department to go get a vehicle that happens to be a scofflaw vehicle?

17

COMBS

A    Not specifically.

Q    When you impounded the vehicle, did you obtain the keys to the vehicle?

A    I did.

Q    How did you obtain the keys to the vehicle?

A    I don't recall.

Q    It is alleged by the plaintiff in the Complaint that you went to his house and knocked on the door at his house at Ten Leonard Avenue in Freeport.

Do you recall doing that?

A    I do not.

Q    It is alleged by the plaintiff that you allegedly stated to him that when you knocked on the door, you told him you were taking his car as a scofflaw and that you could smash the window to get in or he could give you the keys, but you were taking the vehicle either way.

Did you ever say that to him?

A    I don't recall the event, but that's not something I would say.

Q    Was anybody with you when you went

18

COMBS

to his house?

A    I do not recall.

Q    Did you obtain a warrant before you seized the vehicle?

A    No.

Q    Why not?

A    It's not procedure.

Q    When you say "it's not procedure," it's not Freeport Village procedure?

A    Correct.

Q    When his vehicle was seized, did you give the owner of the vehicle any notice of his ability to have a post-seizure hearing?

A    Do not recall.

Q    Are you aware of any procedure maintained by the Village of Freeport within which vehicle owners of vehicles that are to be seized as scofflaws are afforded pre-seizure hearings?

A    Not aware of that.

Q    Are you aware of any procedure maintained by the Village of Freeport within which persons whose vehicles have been seized as scofflaws are afforded a post-seizure hearing?

19

COMBS

A    Not at the time.

Q    That was November 10, 2020, correct?

A    Yup.

Q    By the way, in carrying out your duties on November 10th of 2020 and seizing the vehicle described in Plaintiff's Exhibit 4, did you follow the policies, practices and procedures of the Village of Freeport?

A    I believe so.

Q    Did you violate any policy of the Village of Freeport?

A    I don't think so.

Q    Did you violate any practice of the Village of Freeport?

A    No.

Q    Once you determined that the vehicle was to be seized, what, if anything, did you do?

A    I don't recall on this specific date, but usually we would notify the dispatcher to notify the towing company.

Q    So you wouldn't call the tow company directly, you would notify the dispatcher?

A    Correct.

Q    When you were seeking to determine

20

COMBS

if the vehicle was a scofflaw, what type of database did you access to make that determination?

A     An Excel sheet.

Q     So there's an Excel sheet provided to you as a police officer by the Village which essentially is a list of the scofflaw vehicles, correct?

A     Correct.

Q     Who prepares the Excel sheet?

A     I believe the command staff.

Q     How often do you receive an updated Excel sheet?

A     It varies, but it depends on I guess how many vehicles have been seized off of it, you know, once the updated list comes out.

Q     Well, when you report for duty as a police officer, are you required to first go to the police department?

A     Yes.

Q     Do you have a locker there?

A     I do.

Q     Do you have some form of mailbox there where they can give you notices?

21

COMBS

A        Yes.

Q        So is the way that you would receive the Excel spreadsheet is a copy would be placed in your mailbox?

A        No.

Q        Well, how would you get the Excel sheet?

A        Typically through email, department email.

Q        What is your department email address?

A        It was at the time b.combs@freeportpolice.org.

Q        Did you ever have a meeting with any superior officer at the Freeport Police Department within which their policy on the scofflaws was explained to you?

A        I don't recall.

Q        I'm going to show you what's been marked as Plaintiff's Exhibit 2 and ask if you recognize that document.

(Handing.)

(Witness reviewing document.)

A        I do.

22

COMBS

Q    What is it?

A    It is paperwork that the dispatcher or monitor would print out in relation to an impound.

Q    Do you see up on the upper right-hand corner is a handwritten notation that says PO Combs IMP with a number; do you know what that signifies?

A    When the dispatcher monitor would print this out, they would write my name on it noting it's supposed to go with my paperwork when I return to headquarters, has my name and then impound 770-20 regarding this impound from Leonard Avenue.

Q    This impound pertains to a 2015 Chrysler 200, correct?

A    Yes.

Q    That's the vehicle that you impounded on November 10th of 2020, correct?

A    With the related license plate, yeah, Henry Frank Adam 3718.

Q    According to the report, you were aware that the owner of the vehicle was Alberto T. Higgs, correct?

23

COMBS

A    Yes.

Q    You filled that in on your form, right?

A    Yes.

Q    I'd like to show you what's been marked as Plaintiff's Exhibit 3 and ask if you recognize that document.

(Handing.)

(Witness reviewing document.)

A    Yes.

Q    What is it?

A    It's an email from Chief of Police.

Q    To whom?

A    All Sworn Personnel.

Q    Which included yourself, correct?

A    Yes.

Q    You've seen that before?

A    Yes, on September, looks like . . .

Q    Okay.

A    The year that was printed.

Q    So under the policy maintained by the police department, meaning the Freeport Police Department, a scofflaw vehicle is a vehicle which had three or more outstanding

24

COMBS

parking summonses, correct?

A    That's what the email says.

Q    As you sit here today, was that the policy of the Village of Freeport Police Department as of November 10, 2020?

A    I don't recall.

MS. BENZIE:  Document speaks for itself.

MR. CAMPANELLI:  I'm not asking about the document, I'm asking about his knowledge as a police officer carrying out his duties at the time of the seizure.

Q    In Plaintiff's Exhibit 3, the email, which is issued to All Sworn Personnel within the Freeport Police Department, it says:  If a scofflaw vehicle is located, the vehicle will be impounded as per current guidelines.

Did you receive instructions from the police department that for every vehicle on the Excel list listed as a scofflaw, you were to seize the vehicle?

A    If it's on the scofflaw list, it is to be seized.

Q    Under their policy, practice and

25

COMBS

procedure, you did not need a warrant to make that seizure, correct?

A        Correct.

Q        And under the policy, practice and procedure, you didn't have to make sure that the owner got a pre-seizure hearing before it was seized, correct?

A        Not that I recall at the time.

Q        You have no basis to believe that as of the time that the seizure was made, that the Village of Freeport offered the owners of those vehicles with any post-seizure hearing at which they could challenge the Village's retention of their vehicle; is that correct?

A        Not that I recall.

Q        Meaning you don't recall the existence of any such procedure, correct?

A        Yes.

Q        This email, the last line of which says:  List of vehicles to follow under separate email.

The email is from Smith, Deputy Chief Michael J.

The emails that you received on your

26

COMBS

work email, were they sent to you, to your knowledge, by Chief Deputy Michael J. Smith?

A        Yes.

Q        What was the process by which the owner of a seized vehicle was thereafter able to secure its release after you had impounded it?

A        I'm not sure of the exact procedure, but they were to respond to Freeport Police Headquarters and the desk personnel would advise them.

Q        So they actually had to go to the police department to try to secure the release of their vehicle, correct?

A        I believe so.

Q        To secure the release of their vehicle, they had to pay money to the police department, correct?

A        I believe so.

Q        And to secure the release, the police department would then give them a release authorization which they would then give to the tow company, correct?

A        I believe so.

Q        And before it would be released by

27

COMBS

the tow company, they had to pay money to the tow company, correct?

A        I'm not entire surely of the practices with the tow company and the Village.

Q        Who determined how much money they had to pay to the police department before the vehicle could be released?

A        I'm not aware of that.

Q        I'm going to show you what's been marked as Plaintiff's Exhibit 5 and ask if you recognize that document.

(Handing.)

(Witness reviewing document.)

A        I'm aware of what this document is. I was not involved in either issuing it or making it.

Q        Okay.  Well, this document is entitled VEHICLE RELEASE AUTHORIZATION FREEPORT POLICE DEPARTMENT and it appears to be written regarding the same vehicle you seized with the same owner with the same address and it says Desk Officer's Signature.

Do you recognize the signature or the badge number on the bottom of that document?

28

COMBS

A        I do not.

Q        I'd like to show you what's been marked as Plaintiff's Exhibit 6 and ask if you recognize that document.

(Handing.)

(Witness reviewing document.)

A        I do not recognize this document, it was not prepared by me.

Q        This document was provided by the Village of Freeport's attorney to my office.  It appears to be directed to Alberto Higgs, the plaintiff in this action, at his address pertaining to the same vehicle which you seized without a warrant.

In the middle of the document it states:  The Village of Freeport shall acquire title to this vehicle unless claimed within ten (10) days of the above date.  In such event the vehicle will be destroyed.

Are you aware of whether or not it is the policy, practice or procedure of the Village of Freeport to send notices to the owners of scofflaw vehicles that have been seized that if they do not claim their vehicle

29

COMBS

within ten days, the Village will acquire title to the vehicle and will destroy it?

MS. BENZIE:  Objection, asked and answered.

Over my objection, you may answer.

A       I'm not aware of what happens with vehicles or the paperwork after it's impounded. I'm not desk personnel and I also don't -- I'm not aware of what happens with the Village and their mailing notices.

Q       How long have you been working for the police department as you sit here today, Freeport Police Department?

A       Over eight years.

Q       You don't know what they do with the vehicles if the owners don't claim them after you seize them?

A       No.

Q       In the six years that you've been working for the police department --

A       Eight years.

Q       Eight years, I apologize.

In the eight years you've been working for the Freeport Police Department, how

30

COMBS

many scofflaw vehicles have you seized?

A    I don't know.

Q    Would it be at least a hundred?

A    I don't think so.

Q    Would it be at least 50?

A    Could be, maybe less.

Q    Are there any documents which are in existence that you are aware of which would reflect how many warrantless seizures you've made of scofflaw vehicles?

A    I don't know.

Q    Well, for each scofflaw vehicle, do you prepare a MOTOR VEHICLE IMPOUND WORKSHEET, a copy of which is Plaintiff's 4?

A    We do.

Q    To your knowledge, are these records maintained by the Freeport Police Department?

A    I believe so.

Q    Did you prepare one of these worksheets each and every time you made a warrantless seizure of a vehicle as a scofflaw vehicle?

A    There should be.

Q    So for each seizure you've made in

31

COMBS

the past eight years, there will be one of these forms, correct?

A    Yes.

Q    Did there come a time when the number of vehicles being seized by the police department increased dramatically?

A    Not that I'm aware of.

Q    I'm sorry to make you repeat this.

You started working for the Freeport Police Department when?

A    April of 2015.

Q    Did you ever seize a vehicle for a suspended registration?

A    I have.

Q    Under what circumstances would you seize a vehicle for a suspended registration?

A    If their registration is suspended in the State of New York.

MS. BENZIE:  At this point, I just want to put a statement.

Officer Combs is here strictly with respect to the Higgs case and not with respect to any charge of a suspended registration under New York State, the New

32

COMBS

York State Vehicle and Traffic Law Section 355.

Q    As part of your duties for the police department of Freeport, it is your obligation to carry out the orders of the police department, correct?

A    It is.

Q    Have you ever seen GENERAL ORDER 21F?

(Handing.)

(Witness reviewing document.)

A    Yes.

Q    Freeport Police Department General Order 21F states POLICY and in the POLICY Section A. says:  MEMBERS OF THIS DEPARTMENT SHALL IMPOUND THE FOLLOWING MOTOR VEHICLES and sub-provision A. 7. says:  Except for parked unoccupied vehicles, any vehicle being operated while unregistered or with expired, revoked, or suspended registration.

According to the policy order 21F, is it your understanding that it's the policy of the Freeport Police Department that you are to seize vehicles, all vehicles, if they're being

33

COMBS

operated while their registration was suspended?

A    In regard to suspended registrations.

Q    Yes or no?

A    Yes.

Q    As a police officer, you've seized vehicles for no reason other than the fact they were operated while their registration was suspended, correct?

A    Yes.

Q    How many times?

A    I'm not aware.

Q    At least 50?

A    Maybe less.

Q    Now according to the Freeport Police Department's 2018 Annual Report, the number of vehicles that Freeport police officers impounded in 2015 just for suspended registration was 452 -- and you were working in 2015 -- but the following year in 2016, the number of vehicles which were impounded by Freeport police for suspended registration increased to 1,130, nearly triple.

Do you know what, if anything,

34

COMBS

caused the increase in the number of Freeport police officers seizing motor vehicles for suspended registrations?

A       I do not.

Q       Do you know what the steel ring is?

A       The LPR system?

Q       Okay.  What is the LPR system?

A       It's a series of cameras at entrances to the Village of Freeport that read license plates.

Q       So LPR actually stands for license plate readers, correct?

A       Yes.

Q       There are license plate readers permanently affixed in locations at the entrances and exits to the Village, correct?

A       Yes.

Q       And they're designed to read the license plate of virtually all vehicles entering or exiting the Village, correct?

A       Not all vehicles, but yes.

Q       Then they send some type of communication to police cruisers that a vehicle has been identified as being operated with a

35

COMBS

suspended registration, correct?

A      Yes.

Q      And if you're in your car, you receive that notification, correct?

A      If you have the program up on the computer, yes.

Q      Under the general order of the Freeport Police Department and specifically order 21F, it is then your obligation to pull the car over and impound it, correct?

A      If you have the opportunity to.

Q      Again, under the rules of the Freeport Police Department and the Village, you're not required to obtain a warrant, correct?

A      Correct.

Q      There's no pre-seizure hearing, correct?

A      I'm not aware of that.

Q      You don't have to show that there's any safety issue which would precipitate the seizure, correct?

A      I'm not aware of that.

Q      So if a vehicle's being driven while

36

COMBS

its registration is suspended, even if there's no safety issue, you're obligated still to seize it, correct?

A    If it's suspended by New York State DMV, it is to be impounded.

Q    Without any safety problems, correct?

A    Not that I'm aware of.

Q    And even if the operator is not being arrested, correct?

A    Correct.

This was not an LPR notification nor a scofflaw -- nor a suspended registration, I believe.

Q    When you say "this," you're talking about the Higgs matter, correct?

A    Yeah, the matter we're here for.

Q    Okay, okay.  But I'm asking you about the ordinary practices and procedures of the Freeport Police Department.

A    Okay.

Q    I'm trying to understand what type of procedures they have to afford the owners of seized vehicles with hearings.

37

COMBS

A        Okay.

MS. BENZIE:  And you're specifically talking about 2020, correct?

MR. CAMPANELLI:  No, the questions I just asked him pertain to his entire period working as a Freeport police officer ever since General Order 21F was issued and that was issued on March 10th of 2000.

MS. BENZIE:  Okay.

Q        Correct?

General Order 21F was issued by the Freeport Police Department on March 10, 2000, correct?

A        That's what the paper says.

MS. BENZIE:  Could we take a moment, please?

(Discussion off the record.)

Q        Getting back to Mr. Higgs' vehicle, at the time that you seized his vehicle, you acquired the keys to the vehicle, but you don't recall how you acquired them, correct?

A        Correct.

Q        Do you have any basis to believe they were left in the vehicle?

38

COMBS

A      No.

Q      Is there anyone else who would know how you acquired the keys?

A      Not that I know of.

Q      Was anybody with you when you seized the vehicle?

A      As per the paperwork, Kyle Pistani. Officer Pistani was there.

Q      Are you acquainted with Officer Pistani?

A      I know him.

Q      Is he your partner?

A      No.

Q      Does he work in the same unit?

A      No.

Q      How did it come to pass that Officer Pistani was accompanying you on that particular date if he's not your partner and not part of your unit?

A      Well, likely I put it over the radio and he responded to assist likely.

Q      When you say "I put it over the radio," what does that mean?

A      When we found . . . come across a

39

COMBS

car that's going to be impounded, you notify headquarters, as I said and they notify the tow company, so once it goes over the radio, it's typical that another officer, especially at nighttime, would come and assist you.

Q    By the way, do you have an office at the Freeport Police Department?

A    What do you mean?

Q    Do you have an office you go to when you prepare paperwork; do you have your own desk, do you have your own office, do you just go to a general area at the police department?

A    I do now, but not at the time of this incident.

Q    Well, on November 10th of 2020 when you went to 6 Leonard Avenue or at least you arrived at 6 Leonard Avenue, were you responding to a call regarding some type of ordinance violation?

A    No.

Q    Were you responding to any type of call for a quality of life issue?

A    I was not responding to any call.

Q    Well, how did it come to pass that

40

COMBS

you just happened to arrive at 6 Leonard Avenue on the evening of November 10, 2020?

A    As I stated, we have to patrol the Village, we drive around, it's not just responding to emergencies and just responding to calls, so part of our duty is to patrol the neighborhood.

Q    Do you have a specific area to which you're assigned for patrol?

A    Not at this point.  Not at this time.

Q    What about on November 10th of 2020, were you given a specific area that was your patrol area?

A    I was not given a specific area as my patrol area.

Q    So your job as of November 10, 2020 was to patrol all of the Village?

A    Yes.

Q    For what purpose were you patrolling it, were you trying to see if there were ongoing criminal activity or what?

A    Anything that pertained to my duties that day, so criminal activity, vehicle traffic

41

COMBS

laws, scofflaws.

Q    As of October 10, 2020, how many hours a week did you work?

A    This was November 10th of 2020.

Q    I apologize.

November 10, 2020, how many hours did you work?

A    Typically it was four ten-hour days on and then four days off.

Q    What were your typical hours, day shift, night shift; what was it?

A    It was 1600 hours, so 4:00 p.m. till 2:00 a.m.

Q    And of that time, how much time would you spend looking for scofflaw vehicles?

A    I wasn't specifically looking for scofflaw, I was driving around looking for any criminal activity or anything that pertained to my job as a police officer.

Q    So when you drove around the Village, did you simply run every plate that you came across to see if it was a scofflaw vehicle?

A    No.

Q    What made you run this plate?

42

COMBS

A      I don't know if I ran this plate.  I was familiar with the list that was sent out for scofflaws.

Q      But that would mean that when you came across this vehicle, you looked at the plate and compared it to your scofflaw list, correct?

A      Most likely.

Q      So what precipitated you to do that; did you check every plate on the block?

A      I was always looking at vehicles, but again, maybe I -- the scofflaw list was sent out, you can drive around looking for those plates if you wanted to.

Q      Okay.  So my question is, when you arrived at Leonard Avenue in Freeport, which if you're familiar with it, has multiple vehicles parked on it generally, would you agree with that?

A      Yes.

Q      Did you run the plate on every vehicle that was on the block that evening?

A      I did not.

Q      Why not?

43

COMBS

A    It's not typical procedure.

Q    Well, is the typical procedure to look at one plate, but not the rest?

A    No, we don't have to run every plate on the block.

Q    What made you pick this plate of all the other vehicles on the block to run to check the list?

A    As I recall -- as I said, I do not recall many of the events of that day, but if you look at the scofflaw list, it's not many that are newer to this list, so maybe I recalled that license plate on there.

Q    Oh.  Maybe, you don't know, but maybe?

A    Like I said, I don't recall; this is over three years ago.

Q    Okay, okay.

Did anybody send you to this spot to get this car?

A    No.  You showed me in that other evidence it was officer initiated.

Q    Meaning it was you?

A    I am the officer.

44

COMBS

Q       On the evening you were there on November 10th of 2020, did you have any conversations with the owner of the vehicle?

A       I don't recall.

Q       Did you knock on his door?

A       I don't recall.

Q       Just so the record is clear, as you sit here today, you have no recollection of ever telling the owner of the vehicle that you were seizing his car for unpaid parking tickets; is that correct?

MS. BENZIE:  Asked and answered.

Over my objection, he can answer it again.

A       Can you repeat that?

MR. CAMPANELLI:  Please read the question back.

(The pending question was read.)

A       I do not recall.

Q       Did you ever say to the owner of the car:  You can give us the keys so we don't have to break the window, but we're taking it either way; did you ever say that to the owner of the vehicle?

45

COMBS

A    I do not recall.  As I said before, that's not something I would say and we do not need the keys to impound a vehicle.

Q    But when you left that night, you had the keys for the vehicle?

A    I did.

Q    When you found the vehicle, there was no owner present, correct?

A    Correct.

Q    And the vehicle was locked, correct?

A    I'm not aware.  I normally don't try the door handle.

Q    But the keys weren't in the vehicle, correct?

A    I didn't take them out of the vehicle.

Q    So you had to get them from someplace else, correct?

A    Yes.

Q    But as you sit here today, you have no idea where you got them from; is that correct?

A    I don't recall.

MR. CAMPANELLI:  I have no further

46

questions.

Thank you, sir.

MR. SENDROWITZ:  I have no questions.

(Time noted: 12:45 p.m.)

*     *     *

47

A C K N O W L E D G M E N T

STATE OF NEW YORK      )

                       )ss:

COUNTY OF              )


        I, BRENDAN COMBS, hereby certify that I have

read the transcript of my testimony taken under oath in

my deposition of December 13, 2023; that the transcript

is a true, complete and correct record of what was

asked, answered and said during this deposition, and

that the answers on the record as given by me are true

and correct.



                                _____
                                BRENDAN COMBS


     Subscribed and sworn to

Before me this  25 TH     day

of JANUARY    , 2024.


_____         PEGGY M. LESTER
NOTARY PUBLIC                   Notary Public, State of New York
                                No. 01LE6293122
                                Qualified in Nassau County
                                Commission Expires Nov. 25, 2025

48

E X H I B I T S

PLAINTIFF'S EXHIBITS:

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 1 | Copy of Freeport Police Department blotter entry dated 11/10/2020 Bates stamped 11/30/2023 FREEPORT #13 | 4 |
| 2 | Copy of ejustice read-out, two pages, Bates stamped 11/30/2023 FREEPORT # 3 and #4 | 4 |
| 3 | Copy of email dated 10/26/2016 to All Sworn Personnel from Deputy Chief Michael J. Smith Bates stamped 10/11/2023 FREEPORT #69 | 4 |
| 4 | Copy of FREEPORT POLICE DEPARTMENT MOTOR VEHICLE IMPOUND WORKSHEET Bates stamped 11/30/2023 FREEPORT #2 | 4 |
| 5 | Copy of FREEPORT POLICE DEPARTMENT VEHICLE RELEASE AUTHORIZATION Bates stamped 11/30/2023 FREEPORT #12 | 4 |
| 6 | Copy of letter dated November 17, 2020 to Alberto Higgs from Freeport Police Department Bates stamped 11/30/2023 FREEPORT #6 | 5 |

49

I N D E X

EXAMINATION BY                                          PAGE
MR. CAMPANELLI                                            5

50

C E R T I F I C A T E

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF SUFFOLK     )


          I, JOANN O'LOUGHLIN, a Notary Public for and within the State of New York, do hereby certify:

          That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

          I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of January, 2024.


                              _____
                              JOANN O'LOUGHLIN